**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**Ronald Hedlund,**

*Plaintiff,*

v.                                    Civil Action No. 3:23-cv-00631

**Matthew Mulheim,**
*In his Personal Capacity,*

**Clarke Mercer,**
*In his Personal Capacity*,

**Sandra Gill,**
*In her Personal Capacity,*

**Mark Sykes,**
*In his Personal Capacity*,

**Garrison Wright,**
*In his Personal Capacity,*

**Nicholas Tolbert,**
*In his Personal Capacity,*

**Michael Enz,**
*In his Personal Capacity,*

***and***

**Steven Pike,**
*In his Personal Capacity*,

*Defendants.*

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, Ronald Hedlund ("Mr. Hedlund"), by counsel, and files this action against the above-named Defendants, each in his or personal capacity, and in support thereof states as follows:

1

## INTRODUCTION

1.      This action is brought pursuant to, *inter alia*, 42 USC §§ 1983, and 1985(3), alleging violations of the First and Fourth Amendments to the Constitution of the United States of America, made applicable to the states pursuant to the Fourteenth Amendment to the Constitution of the United States of America, for conspiracy to violate the rights enshrined by such Amendments, and for attendant state law claims of malicious prosecution and false imprisonment.

2.      This action arises from the arrest of Mr. Hedlund on Friday, January 14, 2023, the day prior to Governor Glen Younkin's inauguration, while Mr. Hedlund in a "group" of one was protesting and holding a sign, peaceably exercising his rights protected by the First Amendment of the United States of America and made applicable to the states there of by the Fourteenth Amendment to the Constitution of the United States.

## VENUE AND JURSIDICTION

3.      This Court has subject matter jurisdiction over the Plaintiffs' federal constitutional and conspiracy claims pursuant to 28 U.S.C. § 1331. This Court has subject matter jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

4.      Venue is proper in the Richmond Division of the Federal District Court for the Eastern District of Virginia pursuant to 28 U.S.C. §§ 127 and 1391 and Local Civil Rule 3, as a substantial part of the events giving rise to the claims herein occurred in the City of Richmond— that is, within the Richmond Division of the United States District Courts for the Eastern District of Virginia.

## PARTIES

5.     Plaintiff Ronald Hedlund ("Mr. Hedlund" or "Plaintiff") is a citizen of the United States, a resident of Virginia.  At all times complained of herein Mr. Hedlund was a 61-year-old man and a graduate of Virginia Polytechnic Institute and State University's storied Forestry program.

6.     Defendant Matthew Mulheim ("Mulheim" or "Defendant Mulheim") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto, he was employed, uniformed, and on duty by, with, and for the Virginia Capitol Police Department, and he was acting under color of law.

7.     Defendant Clarke Mercer ("Mercer" or "Defendant Mercer") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto he was employed as then-Governor Ralph Northam's Chief of Staff, and he was acting under color of law.

8.     Defendant Sandra Gill ("Gill" or "Defendant Gill") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto she was employed as the Commonwealth of Virginia's Assistant Director of the Department of General Services, and she was acting under the color of law.

9.     Defendant Mark Sykes ("Sykes" or "Defendant Sykes") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto he was employed as the Assistant Chief of Police for Virginia Capitol Police, and he was acting under the color of law.

10.     Defendant Garrison Wright ("Wright" or "Defendant Wright") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto he was employed as an officer with the Virginia Capitol Police, and he was acting under the color of law.

11.     Defendant Nicholas Tolbert ("Tolbert" or "Defendant Tolbert") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto he was employed as an officer with the Virginia Capitol Police, and he was acting under color of law.

12.     Defendant Michael Enz ("Enz" or "Defendant Enz") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto he was employed as an officer with the Virginia Capitol Police, and he was acting under color of law.

13.     Defendant Steven Pike ("Pike" or "Defendant Pike") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto he was employed as an officer with the Virginia Capitol Police, and he was acting under color of law.

14.     The defendants are joined, pursuant to Federal Rule of Civil Procedure 20, as the claims against the defendants arise from the same occurrence or series of occurrences.

## FACTS

15.     Mr. Hedlund is a known, politically conservative demonstrator in the Richmond area, exercising his First Amendment rights to free speech as well as to petition the government for a redress of his grievances. He is best known for displaying "Fuck Joe Biden" and similar signs on overpasses along Interstate I-95, controversial speech to many made popular from a NASCAR event where fans were chanting "Fuck Joe Biden", audible to viewers of the live broadcast popularized when reporter Stavast stated, "You can hear the chants from the crowd, 'Let's go, Brandon!' .

16.     At no time during the timeframe at issue in this complaint did Mr. Hedlund threaten any Commonwealth employee or any other citizen or act in any threatening manner.

17.     Capitol Square, as defined by the Commonwealth of Virginia, is a park in Richmond, Virginia, enclosed within a wrought-iron fence, bounded and adjacent to on the north

4

by the sidewalk on Capitol Street, on the south by the sidewalk on Bank Street, on the east by the sidewalk on 9th Street, and on the west by the sidewalk on Governor's Street.  It is the home of the Virginia State Capitol, the Senate of Virginia, the House of Delegates, the Executive Mansion, and many monuments memorializing famous Virginians, including Virginians important to the founding of the United States of America, such as George Washington.  It also contains a Civil Rights Memorial.  **Exhibit 1.**[1]

18.      In preparation for Governor Glen Younkin's inauguration, the Virginia Department of General Services had closed Capitol Square for the week of January 9 through January 15, 2022.  Signs were posted on the wrought iron fence enclosing Capitol Square that the square was closed for the week in preparation for the inauguration.  However, the areas surrounding Capitol Square, such as the west side of the Patrick Henry Building, south of Broad Street and east of 12th Street, were not part of this closure, and no agent of the Commonwealth posted signs intimating that it was closed.  In fact, a sign posted on the day Mr. Hedlund was arrested indicated the area was open to the public between 6am and 9pm. **Exhibit 2.**

19.      Mr. Hedlund, wanting to express his displeasure with the outgoing Northam administration, as well as his displeasure with the legal status of abortion in the United States of America, and positions advocated by Governor Northam regarding abortion, decided to protest.  Aware of the closures, and desiring to be compliant with the law, Mr. Hedlund decided to demonstrate on public property on the west side of the Patrick Henry Building, between the Patrick Henry Building and 12th Street, and completely outside of Capitol Square or its wrought iron fence where the closure notices were posted (the "Demonstration Site").

---

[1] https://virginiacapitol.gov/wp-content/uploads/2016/04/English-both-sides.pdf (last accessed August 3, 2023).

20.     Mr. Hedlund chose this spot for the Demonstration Site because it was outside of the closed spaces and was situated in an area where he believed former Governor Northam, as well as others, would see his protest.  It also had a sign posted stating that it was open to the public at 8:00 am and closed at 5 PM. See **Exhibit 2**, a true and accurate image from a video Mr. Hedlund created at the location**.**

21.     In order to express his political beliefs, Mr. Hedlund created a sign (the "Sign") to hold.  On one side, the sign read "Fuck Governor Coon Face" in reference to the allegations that the outgoing Governor had appeared in blackface in the Eastern Virginia Medical School's 1984 Yearbook.[2]  The other side of the sign contained a photograph of an aborted fetus.

22.     At no time during the events described herein was Mr. Hedlund joined by other demonstrators. He acted and remained alone in his protest.

23.     At no time in the events described herein did Mr. Hedlund enter or attempt to enter Capitol Square.

24.     At no time during the events described herein did Mr. Hedlund affix, post, hang, tie, fasten, or suspend his sign to or on any property owned or managed by Virginia Department of General Services, or any tree, pole, or other landscape or architectural feature of any of the

---

[2] In 2019, a photo of two individuals from the Eastern Virginia Medical School's 1984 yearbook had previously surfaced showing one person was blackface, and another dressed in a Ku Klux Klan robe.  Rumors circulated that the man in black face was former Governor Northam.  On or around February 15, 2019, former Governor Northam admitted to appearing in the photo and issued an apology for his decision to appear in the photo.  However, former Governor Northam did not specify whether he was the individual in black face, or whether he was the individual in the Ku Klux Klan robe. See,  https://www.washingtonpost.com/local/virginia-politics/va-gov-northams-medical-school-yearbook-page-shows-men-in-blackface-kkk-robe/2019/02/01/517a43ee-265f-11e9-90cd-dedb0c92dc17_story.html. (last accessed August 3, 2023).

Virginia Department of General Services ("DGS")'s property, and at no time did he attempt to do so.

25.     Prior to the incident, on January 12, 2022, at approximately 8:09 AM, Mr. Hedlund placed himself at the Demonstration Site, without the sign, to look around.  On or around 8:09 AM, while at his chosen demonstration site, Mr. Hedlund first met Defendant Sykes. Defendant Sykes approached Mr. Hedlund to see what Mr. Hedlund was doing.  Defendant Sykes was in uniform.  After a brief and peaceable exchange, Defendant Sykes left Mr. Hudlund and went about his official business of the day.  At no time did Defendant Sykes intimate that there was anything wrong with Mr. Hedlund or his presence at the Demonstration Site.

26.     Mr. Hedlund then left and went to the main entrance of the new General Assembly Building (outside of Capitol Square, bordered on the north by Broad Street, on the south by Capitol Street, on the west by 9th Street, and on the east by a parking garage) where he met and discussed issues with various senators and delegates.  At no time did anyone approach Mr. Hedlund or ask him to leave.  However, Mr. Hedlund did have a conversation with an unidentified female with the Department of Capitol Police who advised him that it was ok to be in that areas but asked him not to block any entrances or exits.

## OUTSIDE THE PATRICK HENRY BUILDING AT THE DEMONSTRATION SITE
## JANUARY 14, 2022 BETWEEN 8:59 AM AND 9:45 AM

27.     On the morning of Friday, January 14, 2022, Mr. Hedlund returned to the Demonstration Site, alone, with the sign, and wholly without any voice amplification.  It was Mr. Hedlund's *modus operandi* during his demonstrations to let his sign speak for itself, and to engage calmly and politely any person who wished to ask him about it or to inquire what he was doing.

28.     On or around 8:59 AM on Friday, January 14, 2022, while at the Demonstration Site with his Sign, and while being quiet and peaceable, Defendants Tolbert and Enz approached Mr. Hedlund.

29.     At that time, Defendant Tolbert, all in the presence of Defendant Enz, confirmed that he was aware that Mr. Hedlund and Defendant Sykes had met days before.

30.     At that time, Defendant Tolbert in the presence of Defendant Enz, asked Mr. Hedlund  not to impede any of the personnel loading and moving gear in preparation for the inauguration and to stay away from the equipment. Mr. Hedlund agreed, had not impeded any such personnel and in fact Mr. Hedlund politely asked the workers to let them know if he was in their way at all.

31.     At that time, Defendant Tolbert in the presence of Defendant Enz, both asked Mr. Hedlund to "do [him] a favor and stay out of the [Capitol] Square" and confirmed that "[t]here's nothing wrong with being [Mr. Hedlund] being outside of the [Capitol] Square."

32.     After this exchange, Defendants Tolbert and Enz left, and Mr. Hudlund continued his peaceful demonstration. **Exhibit 3** is a video of these events.

33.     Roughly seven minutes later, on or around 9:03 AM, on January 14, 2022, Defendant Mercer came down to the Demonstration Site, taking photos of Mr. Hedlund, and talking on his (Mercer's) phone.  When Mr. Hedlund asked the individual who was photographing him to identify himself, the individual refused, stating, "No, not to you. No." This individual appears to be Defendant Mercer, with Defendants Talbert and Enz watching. After refusing to identify himself and after taking photos of Mr. Hedlund, Defendant Mercer left. **Exhibit 4.**

34.     Shortly after Defendant Mercer left, on or around 9:12 AM, on January 14, 2022, Defendant Gill approached Mr. Hedlund.  Defendant Gill *also* refused to identify herself apart from being "with the Department of General Services" and told Mr. Hedlund he needed to "leave the property" because he "needed a permit" for his demonstration.

35.     Mr. Hedlund's Video, attached hereto as **Exhibit 5,** shows the conversation between Mr. Hedlund and Defendant Gill, which lasted about fifty-one seconds and went, in part, as follows:

**Mr. Hedlund**: I'm sorry, you just asked me to leave the property?

**Defendant Gill**: Correct. I'm with the Department of General Services.

**Mr. Hedlund**: You said I needed a permit?

**Defendant Gill:** Yes. If you go to our website, you'll see that this is a permitted area, and you're required to have a permit. You need to leave.

**Mr. Hedlund:** I have a permit[3]. Yep, I do have...

**Defendant Gill:** Can I see your permit? We issue those.

**Mr. Hedlund:** No. I don't know who you are. What's your name? You said you were the Department of General Services...

**Defendant Gill:** I'm with the Department of General Services.

**Mr. Hedlund:** But what is your position and your name with them?

**Defendant Gill:** Sir, you need to leave the premises.

**Mr. Hedlund:** What is your position and your name with the Department of General Services? How do I know that you have any authority to order me off the property?

**Defendant Gill:** Sir, if you have a permit as you've indicated, if you could please show me that permit, you may remain.

---

[3] The First Amendment to the United States of America and its attendant case law was this permit to which Mr. Hedlund was referring.

**Mr. Hedlund:** I'm not showing you anything until you tell me what authority you have to order me off the property.

**Defendant Gill:** Sir, I've asked you to leave. I'll get the Capitol police.

**Mr. Hedlund:** They've already been out here all morning with me.

**Defendant Gill:** And You've not been... Have they requested you to leave?

**Mr. Hedlund:** No, they have not requested I leave.

**Defendant Gill:** Thank you, sir. I'll be back.

**Mr. Hedlund:** Okay.

36.     A true and accurate copy of the Department of General Services permit information from their website, as it existed on January 28, 2022 is attached hereto as **Exhibit 6**. It requires permits only for "events," defined as "the assemblage on property controlled by the Department of **ten (10) or more persons** for any demonstration, rally, march, performance, picketing, speechmaking, holding of vigils, sit-ins, or other activities that involve the communication or expression of views or ideas having the effect intent or propensity to draw a crowd or onlookers."(emphasis added).

37.     Shortly after Defendant Gill left, at or around 9:18 AM, January 14, 2022, Defendants Tolbert and Enz returned to confront Mr. Hedlund.  Defendant Tolbert, in the presence of Defendant Enz, demanded that Mr. Hedlund leave the premises, and threatened him with a criminal trespass charge if he did not. At the time, Mr. Hedlund was on a passage designated for general public access, to which the Virginia criminal trespass law does not apply. *Miller v. Commonwealth*, 10 Va. App. 472, 475 (1990). Mr. Hedlund, asserting his bona fide claim of right, told Defendant Tolbert, in the presence of Defendant Enz, that this was "a public access area" and "a public forum."

38.     When Mr. Hedlund asked, Defendant Tolbert told him the issue was not Mr. Hedlund's presence, but his Sign's and that he needed a permit.  Standing on his rights, and stating that it was "protected political speech," Mr. Hedlund declined to leave, stating he had a "permit under the Constitution of the United States of America," and Defendants Tolbert and Enz backed away and Defendant Tolbert began to talk to someone on his radio.

39.     Mr. Hedlund's video recording of this interaction, attached hereto as **Exhibit 7** shows this conversation between Mr. Hedlund and Defendant Tolbert went as follows:

**Defendant Tolbert:** All right, sir. So as of right now, unless you have a permit to be here, you can't be here. Okay? So, at this time, I'm asking you to leave. If you don't, I'll have to charge you with trespassing, okay?

**Mr. Hedlund:**  Where is there any signs that say I'm not allowed to be here?

**Defendant Tolbert**: It's a policy created for the state government buildings in this area.

**Ron Hedlund:** I will tell you that I've already been told by Capitol Police I'm not allowed to go inside the gate and the fenced area there, that the Capitol Square is closed off. Any roads and additional spaces that are closed off are signed, and there's no signage here. People are walking in and out. It's a public access area. You can go up through there. There're tons of people coming up and through here, and that is a public street.

**Defendant Tolbert:** Sir, again, unless you have a permit to display this sign right outside of a state building—

**Mr. Hedlund:** So that's the issue. It's the sign, it's not my presence. It's the sign's presence.

**Defendant Tolbert:** Yes.

**Mr. Hedlund:** It's protected political speech. I have a permit under the Constitution of the United States of America and the...

**Defendant Tolbert:** You have to get a permit through DGS for the state government to have it displayed here.

**Mr. Hedlund:** No, I don't.

**Defendant Tolbert:** Yes, you do.

**Mr. Hedlund:** No, I don't.

**Defendant Tolbert:** Yes, you do.

**Mr. Hedlund:** I cannot go inside that building right there, but this is a public forum right here. See that memorial right there? They've established that the Commonwealth Public Safety Memorial—I'm going to go over here and take video of it. This is for the public, the Commonwealth Public Safety Memorial. This is an established public forum, and I challenge you to violate my civil rights. There is no temporary signage restricting this forum. It is a public forum. I will not go inside the building. But I know why you're upset because this is the governor's office, and they don't want the Governor to see my sign between the governor's mansion and the Governor's office. But this is a public forum established by the Commonwealth of Virginia. That is a public memorial open to the public. All I ask is that when you arrest me, do not cut my phone off. That would be another violation of my civil rights.

**Defendant Tolbert:** Sir, the only thing I'm asking you to do is to move away from this entrance of the building to Governor Street or Bank Street on a public sidewalk.

**Mr. Hedlund:** I'm going to stand right next to the public memorial.  This is the public memorial. I will not move from here.  [Speaking to the recording:] This is a bad spot to stand because of the diesel generator that's running right there. But they're making up shit because the Governor's office is inside this building, the old Virginia State Library. And again, in fact, I'll just prop the sign up right there. So this is the memorial open to the public. "Honored here are public safety officers as defined by the Line of Duty Act." So I'm guessing these are police. I don't know. Anyway, dedicated 2014 and again, Commonwealth Public Safety Memorial. This is open to the public. Normally, the Capitol Square is open to the public, but it is closed for the inauguration, so I will respect that. But I am staying right here.

40.     After speaking on the radio, on or around 9:24 AM on January 14, 2022,

Defendants Tolbert and Enz again confronted Mr. Hedlund.  Defendant Tolbert, in the presence

of Officer Enz, again demanded that Mr. Hedlund leave because Mr. Hedlund did not have a

permit.  Again, Mr. Hedlund stood upon his rights, asserted a bona fide claim of right, and

refused.

41.     This conversation between Mr. Hedlund and Defendant Tolbert went, in part, as

follows, as recorded in the video by Mr. Hedlund:

**Mr. Hedlund:**  So you've always needed to have a permit to be here, but nobody's ever checked anybody's permit until I have a sign.

**Defendant Tolbert:** We check permits all the time, sir.[4]

**Mr. Hedlund:** Nope. I was here Wednesday. Your Assistant Chief was fine with me being here. Go get your Assistant Chief and let him reverse his story now. I want to talk to him. It was fine for me to be here Wednesday, but now, because it's the governor's last full day, I can't be here. Because I'm guessing he's inside this building and he wants to walk across over to the mansion and doesn't want to be seen with this sign in his face. So they're going to drag me off of the public square—a public forum—to redress my grievances against this asshole governor, and they want to make me leave. But it was fine for me to be here all morning.

**Defendant Tolbert:** It was never fine.

**Mr. Hedlund:** You were fine with it.

**Defendant Tolbert:** No. I'm telling you to—

**Mr. Hedlund:** Now you came out and said I need a permit. You didn't say anything about a permit until somebody got in your face and said, "Go get him out of here."

**Defendant Tolbert**: No, because you do need a permit to be out here.

**Mr. Hedlund:** No, you don't. Then why didn't you tell me that this morning? Because you're so dumb you didn't even remember what was required and what's not required. So, when did they make a permit required? I was here for eight years, 20 years ago, 25 years ago. You never needed a permit to be here.

**Defendant Tolbert:** Because you're outside of a state building, sir.

**Mr. Hedlund:** That's bullshit.

**Defendant Tolbert:** If you were over on the sidewalk over there, or if you were on Capitol Bank Street side—Bank Street, where the sidewalk is—

**Mr. Hedlund:** Even if I was in Capitol Square. Now, Capitol Square has been closed off for special conditions for the inauguration. This is not closed off.

**Defendant Tolbert:** This is outside of a state-owned building.

**Mr. Hedlund:** It doesn't matter if you're outside a state building. You have authority inside that state building. I've got authority outside the state building.

**Defendant Tolbert:** You don't have a permit to be here, sir.

---

[4] No Defendant or the Capitol Police "checked the permit" of anyone else outside of Capitol Square during the timeframe at issue in this litigation.

**Mr. Hedlund:** I told you, I have a permit.

**Defendant Tolbert**: No, you do not.

**Mr. Hedlund:** First Amendment is my permit. And there's nothing in the Virginia Code that says otherwise.

**Defendant Tolbert:** Yeah, but every person has to go through DGS.

**Mr. Hedlund**: No, they don't.

**Defendant Tolbert:** Which is owned by the state, to have a permit for anything like this.

**Mr. Hedlund:** No. Now, to park that truck there, yeah. Now, if I had a group of 100 people here today, yeah, I'd need a permit. I am not here with anyone else. I'm here as an individual, exercising my constitutionally protected right to free speech.

**Defendant Tolbert:** [On the Radio] Go ahead.

**Mr. Hedlund:** [To a photographer passing by] Do you have a permit to be here, sir? You're not allowed to be here unless you have a permit.

**Defendant Tolbert:** [On the Radio] Well, he's still here.

**Mr. Hedlund:** Where's your permit?

**Defendant Tolbert:** [On the Radio] And we've told him already, but…

**Mr. Hedlund:** [Speaking to the recording:] By the way, that photographer is a historic figure here at the Capitol, and he doesn't need a permit outside. He needs one inside for his special access, because he's going to be taking pictures of the governor and the governor elect.

42.    Shortly after this conversation, on or around 9:37 AM on January 14, 2022, two other officers, Defendant Mulheim and Defendant Wright, arrived at the Demonstration Site in an SUV and approached Mr. Hedlund.

43.    Defendant Mulheim, in the presence of Defendants Wright, Tolbert, and Enz, presented Mr. Hedlund with papers Defendant Mulheim represented were the regulations of

14

Capitol Square. **Exhibit 6.**[5]  Defendant Mulheim also stated that he would send Mr. Hedlund an

interlink for the permitting process as well, but Mr. Hedlund could not be "right here." Mr.

Hedlund's video of this interaction appears as **Exhibit 10.**

44.     Defendant Mulheim then stated he was going to give Mr. Hedlund one chance to

leave, and if he refused, Mr. Hedlund would be arrested for criminal trespassing. Mr. Hedlund

outside of Capitol Square, and was on a passageway designated for general public access, to

which the Virginia criminal trespass law does not apply. *Miller v. Commonwealth*, 10 Va. App.

472, 475 (1990).

45.     Mr. Hedlund protested that he was leaving the "public forum" under duress, under

threat of a criminal trespass charge, and he asked where he was permitted to be. Defendant

Mulheim directed Mr. Hedlund to either (1) on the other side of 14th Street (two city blocks to

the east of the Demonstration Site), (2) the other side of Main Street (two city blocks south of the

Demonstration Site), or (3) on areas on 9th Street that are not in front of state-owned property

(approximately two city blocks to the west of the Demonstration Site). Mr. Hedlund protested

that that was not consistent with the information publicly available, and the information he was

previously given by the Assistant Chief, and asked what the Assistant Chief was mistaken about.

46.     Defendant Mulheim responded that it was Department of General Services

regulations. He acknowledged that he was going to arrest Mr. Hedlund if he stayed. Mr. Hedlund

moved, shadowed closely by the two officers to the corner of 12th Street and Governor's Street.

---

[5] Mr. Hedlund lost the original papers during the arrest.  Exhibit 6 is a copy of the regulations
provided to Mr. Hedlund on January 28, 2023, or two weeks after the arrest by the Capitol Police
pursuant to a FOIA request.  However, for all purposes they are identical as the regulations did
not change between January 14, 2022 and January 23, 2022.

47.     Mr. Hedlund asked where were the signs at the Demonstration Site regarding demonstrations and trespass (unlike Capitol Square which had posted notices ), and Defendant Mulheim responded that they were at dgs.virginia.gov, referencing the regulations apparently, and responded to a follow up question about the signs by telling Mr. Hedlund that Mr. Hedlund was either going to leave or be arrested, and to "Keep on going."

48.     Mr. Hedlund again asked Defendant Mulheim where he should go, suggesting that he move past the gate at the intersection on 12th Street, between Governor's Street and Broad Street.  Defendant Mulheim stated, "Nope.  All the way across Broad Street" (This would be one city block to the north).

49.     Admirably, Mr. Hedlund refused to yield his constitutional rights any further, and Defendants Mulheim and Wright, and in the presence of Officers Talbert and Enz, arrested Mr. Hedlund, just outside the gate, on the sidewalk bordering the Patrick Henry Building and 12th Street, for criminal trespass notwithstanding the bona fide claim of right asserted multiple times by Mr. Hedlund, which under clearly established Virginia law, itself negates the requisite *mens rea* for criminal trespass in Virginia.  Defendant Mulheim, in plain view of Defendants Wright, Enz, and Tolbert, searched Mr. Hedlund and did not read Mr. Hedlund his Miranda rights.

50.     During this arrest, Defendant Wright grabbed Mr. Hedlund's cellphone and threw it to the ground to end the recording and potentially destroy prior recordings, and also grabbed Mr. Hedlund for the purpose of cuffing him.

51.     Defendants Talbert and Enz stood by and watched, as Defendants Mulheim and Wright arrested Mr. Hedlund, placed him in handcuffs, and searched him. Neither Tolbert nor Enz intervened or attempted to intervene to stop Defendants Wright and Mulheim, though they could have done so.

16

52.     Defendant Wright then charged Mr. Hedlund with criminal trespass ostensibly under Virginia Code § 18.2-119 and took him to the Richmond City Justice Center[6] where Mr. Hedlund was booked.  Defendant Wright again searched Mr. Hedlund at the Richmond City Justice Center.  Officer Wright also issued to Mr. Hedlund a No Trespass/Barment notice stating Mr. Hedlund was barred for "[p]rotesting without a permit and refusing to leave. Also becoming a possible threat to the state employees." **Exhibit 9** is a redacted copy of this notice. Defendant Enz along with Defendant Wright then transported Mr. Hedlund to the Richmond City Justice Center and Defendant Mulheim seized the Sign and logged it into Virginia Capitol Police Property.

53.     The Conversation between Mr. Hedlund and Defendants Mulheim and Wright, as recorded by Mr. Hedlund in **Exhibit 10**, went as follows:

**Defendant Mulheim**:  All right, Mr. Hedlund.

**Mr. Hedlund**: Yes, sir.

**Defendant Mulheim**: We got a paper copy of the regulations of Capitol Square for you.

**Mr. Hedlund**: Okay.

**Defendant Mulheim**: And I can send you a link too for the permitting process, but you can't be right here.

**Mr. Hedlund**: Okay.

**Defendant Mulheim**: So, what we're going to ask you to do is I'm going to give you one chance to leave.

**Mr. Hedlund**: Okay.

**Mr. Hedlund**: If you refuse, you're going to be arrested for trespassing.

**Mr. Hedlund**: Okay. So, I am leaving under duress, under the threat of trespass, of the violation of my civil rights, to leave this public forum, which is established right here.

---

[6] This is the official name of the City of Richmond's jail.

**Defendant Mulheim**: It's not public forum.

**Mr. Hedlund**: It is a public forum.

**Defendant Mulheim**: It is Capitol Square.

**Mr. Hedlund**: It is a public forum.

**Defendant Mulheim**: This is your opportunity to leave right now.

**Mr. Hedlund**: I'm going to leave. I am going to leave under the threat of arrest—

**Defendant Mulheim**: Okay.

**Mr. Hedlund**: —violation. And go ahead and give me your name and badge number, sir.

**Defendant Mulheim**: First Sergeant Mulheim.

**Mr. Hedlund**: Badge number, sir?

**Defendant Mulheim**: It doesn't really matter, but Unit 10.

**Mr. Hedlund**: Unit 10? And you, sir?

**Defendant. Wright**: Officer Wright, 249.

**Mr. Hedlund**: And this is Capitol Police. Thank you very much. Now where am I permitted to be?

**Defendant Mulheim**: On the other side of Broad Street.

**Mr. Hedlund**: Okay. What about that public road right there?

**Defendant Mulheim**: Nope. On the other side of 14th Street, on the other side of Main Street and on areas on 9th Street that aren't in front of any of the state-owned properties.

**Mr. Hedlund**: That's not what's reported publicly. I've already been in areas with Capitol Police allowing me to be— in fact, your assistant chief allowed me to be here Wednesday. What was he mistaken about?

**Defendant Mulheim**: Well, we've got DGS regulations, which I told you I would forward to you if you'd like.

**Mr. Hedlund**: What was your capt-- What was your assistant chief mistaken about?

**Defendant Mulheim**: Sir, you can leave now. I was trying to provide you the information.

**Mr. Hedlund**: Well, if I leave you and I can't have this conversation. I'm asking for-

**Defendant Mulheim**: You [inaudible] to leave right now. I was trying to help you out with the information, but you just want to argue. So you can go ahead-

**Mr. Hedlund**: Are you on drugs, sir? Why are you shaking?

**Defendant Mulheim**: It's cold out here. Sir, you can leave now.

**Mr. Hedlund**: Why are you shaking? I'm leaving.

**Defendant Mulheim**: Sir, you can leave now.

**Mr. Hedlund**: Under the threat of arrest. You are going to arrest me if I stay?

**Defendant Mulheim**: Yes.

**Mr. Hedlund**: You are going to arrest me?

**Defendant Mulheim**: Yes.

**Mr. Hedlund**: Yep. So, what was your assistant chief mistaken about?

**Defendant Mulheim**: I don't know what your conversation was with our assistant chief, but I'm asking you to leave.

**Mr. Hedlund**: He entertained me over there right next to that memorial and he was fine with me being there.

**Defendant Mulheim**: Okay, sir, well, right now I'm asking you to leave.

**Mr. Hedlund**: He's on YouTube and it was fine to be there Wednesday, but today is not.

**Defendant Mulheim**: Okay.

**Mr. Hedlund**: Huh? Only under the threat of arrest. Now let me ask you if I am arrested—

**Defendant Mulheim**: I'm not having any more conversation. You're either leaving or getting arrested.

**Mr. Hedlund**: If I am arrested, where will I be taken?

**Defendant Mulheim**: To the Richmond Justice Center.

**Mr. Hedlund**: And then they will drop the charges after I'm booked in there and they'll just let it go. And then you'll have me off the property for a few hours. So, for that reason, I'll go ahead and just leave out of here because I'll be taken out of here if I don't leave on my own accord.

**Defendant Mulheim**: You might want to start watching where you're going so you don't trip over things.

**Mr. Hedlund**: You're not responsible for my public safety, my personal safety.

**Defendant Mulheim**: I'm just trying to help you out so you don't fall and crack your head open.

**Mr. Hedlund**: So where are the signs that say you can't be here? Where are they?

**Defendant Mulheim**: DGS.virginia.gov has the regulations—

**Mr. Hedlund**: No. Where are the signs that say the public is not allowed in here?

**Defendant Mulheim**: You're either leaving or getting arrested.

**Mr. Hedlund**: Where are the signs?

**Defendant Mulheim**: Keep on going.

**Mr**. **Hedlund**: There are no signs.

**Defendant Mulheim**: Keep on going.

**Mr. Hedlund**: And how far right past this gate here?

**Defendant Mulheim**: Nope. All the way across Broad Street.

**Mr. Hedlund**: No, sir.

**Defendant Mulheim**: Yep.

**Mr. Hedlund**: Arrest me.

**Defendant Mulheim**: Okay.

**Mr. Hedlund**: Take me. You don't need to squeeze me. I'm not resisting anything.

**Defendant Wright**: I'm just trying to get it together so that can get the handcuffs on there.

**Defendant Mulheim**: No. You're being an asshole.

**Defendant Wright**: Here we go.

**Mr. Hedlund**: You're being an asshole. You're being an asshole.

**Defendant Wright**: [inaudible] We got one in custody. Trespassing. [inaudible]

**Defendant Mulheim** : Do what?

**Defendant Wright**: Double [inaudible].

**Defendant Mulheim**: Oh, okay.

**Defendant Wright**: He's going to jail.

**Mr. Hedlund**: And he threw my phone on the ground there so hard that the pen came out of it. I want to make sure I don't lose my pen and my phone. [To a third party:] Thank you for recording. Make sure it's video on YouTube.

**Defendant Wright**: We will. Okay. All right.

**Mr. Hedlund**: I'm arrested for being in a public forum. They threw my phone on the ground on the cement.

**Defendant Wright**: I set it on the ground, sir.

**Mr. Hedlund**: No, you threw it and the pen came out of the phone with such force. You threw it.

## **DGS PERMIT REQUIREMENTS**

54.     While it is true that pursuant to content neutral reasonable time place and manner restrictions in the regulations of the Department of General Services, certain demonstrations do require permits, it is equally true that not all demonstrations require permits.[7]

---

[7] See Exhibit 6.

55.     Particularly, the Department of General Services regulations govern Capital Square, which is "the historic grounds and structures surrounding the Virginia Capitol that are bound by a decorative iron fence," and they only require permits only for an "event," which is defined as comprising of TEN (10) or more people. Likewise, an act of the Virginia General Assembly in 2021 extended the permit requirement to all Department of General Services-controlled property, but only for any "event," which the act defines as comprising of TEN (10) or more people.

56.     At no time did Mr. Hedlund's demonstration exceed ONE (1) person, and thus at no time was Mr. Hedlund required to have a permit.

57.     Mr. Hedlund was not prohibited under the regulations or law to demonstrate at the Demonstration Site at the time when or in the manner in which he was demonstrating, as evident by the plain language on the documents Defendant Mulheim held in his hand and gave to Mr. Hedlund on January 14, 2022, designed to inform the lay person regarding when a permit is and is not needed.[8]

58.     Mr. Hedlund was not prohibited under the regulations to demonstrate at the Demonstration Site at the time, place or manner in which he was demonstrating which was evident on the first page of the documents contained in the hyperlink[9] that Defendant Gill forwarded to Defendant Sykes, who in turn gave it to Defendant Mulheim to use to remove Mr. Hedlund from the Demonstration Site.  **Exhibit 6.**

**<u>INSIDE THE PATRICK HENRY BUILDING ON JANUARY 14, 2022<br>BETWEEN 8:59 AM AND 9:37 AM</u>**

---

[8] Exhibit 10 at 0:00 – 0:21.
[9] This link is, as of August 3, 2023, a dead link.

59.     Unbeknownst to Mr. Hudlund, after Defendant Mercer saw the content of Mr. Hedlund's sign, he returned inside the Patrick Henry Building and informed Defendant Tolbert that, **due to the contents of the Sign**, Mr. Hedlund needed to be removed.[10]

60.     Defendant Mercer also called the Chief of the Virginia Capitol Police, Defendant Pike, as well as the Department of General Services demanding that Mr. Hedlund be removed from the premises.

61.     Defendant Pike informed both Defendant Tolbert and Defendant Mulheim that Mr. Hedlund needed to be removed **due to the content of the sign**.[11]  Defendant Pike tasked Defendant Sykes, Tolbert, Mulheim, and Wright with removing him, on the orders of Defendant Mercer.

62.     Understanding that simply removing Mr. Hedlund for the contents of his sign would be view point specific censorship and would violated Mr. Hedlund's First Amendment Activities, Defendants Mercer, Pike, Sykes, Gill, and Mulheim knowingly concocted a plan to have Mr. Hedlund removed by alleging that he needed a permit and threatening with criminal trespass and/or arresting him for criminal trespass if he refused hoping that Mr. Hedlund would not look too deeply into the actual permitting requirements.

63.     To add an air of credibility to the accusations and gravity to the threat the Defendants were planning, Defendant Gill alleged that Mr. Hedlund had threatened her, which is false, and Defendant Mercer claimed Mr. Hedlund was "harassing" employees, which is also false.

---

[10] Exhibit 11
[11] Exhibit 11

64.     After Defendant Gill's failed attempt to remove Mr. Hedlund, during these discussions, Defendant Sykes, asked Defendant Gill to forward to him the Department of General Services permitting paperwork via e-mail.[12]

65.     On or around 9:28 AM on Friday, January 14, 2022, Defendant Gill forwarded the hyperlink that at the time[13] contained the regulations and paperwork to Defendant Sykes.[14]

66.     On or around 9:29 AM, on Friday, January 14, 2022, Defendant Sykes forwarded the same to Defendant Pike with the message "FYSA" meaning "for your situational awareness" and Defendant Pike responded with "Received."[15]

67.     Thus, not only were Defendants Mercer, Pike, Sykes, and Gill aware that removing Mr. Hedlund for the content of his Sign violate his First Amendment Rights, but they were also aware that the Department of General Services regulations did not require Mr. Hedlund to have a permit.  This was explicit in the documents that Gill forwarded to Sykes, and that Sykes forwarded to Pike.  Thus, they all had knowledge that any attempts at an arrest using this pretext would violate Mr. Hedlund's clearly established First Amendment, and any subsequent arrest based on this pretext would violate not only Mr. Hedlund's clearly established Fourth Amendment Rights as well as run afoul of various state law and torts.

68.     Nevertheless, acting in furtherance of this plan, Defendant Pike had the regulations from the e-mail printed and given to Defendants Mulheim and Wright with orders to either remove Mr. Hedlund or arrest him for criminal trespass.[16]  These were the documents that

---

[12] Exhibit 12.
[13] This link is, as of August 3, 2023, a dead link.
[14] Exhibit 12.
[15] Exhibit 12.
[16] Exhibit 11.

Defendants Mulheim and Wright carried with them to arrest Mr. Hedlund.  Defendant Pike also

ordered Defendants Tolbert and Enz to support Defendants Mulheim and Wright.[17]

69.     Thus, both Defendant Mulheim and Defendant Wright knew or should have

known that there was no permit requirement as it pertained to Mr. Hedlund, that they were

wholly without authority to demand he be permitted or be arrested, and that they could not arrest

him for criminal trespass if he refused to quit demonstrating because a permit was not required,

and further that under clearly established law, a bona fide claim of right, even if mistaken

negated the *mens rea* or criminal intent necessary for a criminal trespass conviction.  However,

they both agreed to go forward with this plan, knowing they had no authority to arrest Mr.

Hedlund, and knowing that the motivation for this order to remove or arrest Mr. Hedlund was

due *uniquely* to the content of the Sign.

70.     Further, the clearly established law of Virginia makes the Virginia criminal

trespass statute, Virginia Code § 18.2-119, inapplicable to thoroughfares, or passages designated

for general public access, such as the space Mr. Hedlund was on at all times relevant hereto.

*Miller v. Commonwealth*, 10 Va. App. 472, 475 (1990).

71. Further the well-established law of the Commonwealth of Virginia reads Virginia

Code § 18.2-119, the criminal trespass statute, to require the criminal mind or intent*, Campbell v*

*Commonwealth*, 41 Va. (2 Rob.) 791 (1843), the *mens rea* which a claim of right negates as a

matter of law.  *Wise v Commonwealth of Virginia*,98 Va. 837 (1990); *Reed v. Commonwealth*, 6

Va. App. 65, 70, 366 S.E.2d 274, 277 (1988)(Where the complainant provides the existence of

the bona fide claim of right, even if mistaken, there cannot be *mens rea* or any probable cause to

issue the warrant.)

---

[17] Exhibit 11.

72.     Defendants Enz and Tolbert were also aware of the reason that they had been ordered to remove Mr. Hedlund, that is they were aware of Defendant Mercer's orders, the motivation behind the orders – that is the content of the Sign – and had *scienter* that the neither the DGS regulations nor the law provided legal justification for the actions that Pike had instructed them to carry out.

## PROCEEDINGS AFTER THE ARREST – THE WARRANT AND CRIMINAL PROSECUTION

73.     After arresting Mr. Hedlund, Defendants Wright and Enz transported Mr. Hedlund to the Richmond City Justice Center where Defendant Wright, in the presence of Defendant Enz obtained an arrest warrant for Mr. Hedlund from the Magistrate.[18]

74.     In order to obtain this warrant, upon information and belief, officer Wright knowingly and intentionally omitted relevant facts and included knowingly and intentionally false statements of facts in his affidavit to the magistrate intending the magistrate to rely upon the same when determining whether to issue the magistrate, which included the following:

a.      An omission that Mr. Hedlund was not required under law or Department of General Services regulations to have a permit in order to demonstrate with his Sign at the Demonstration area in the manner in which Mr. Hedlund was demonstrating.

b.      An omission that the Department of General Services regulations requiring a permit applied only to groups of 10 or more persons and that Mr. Hedlund was there by himself.

c.      An omission that Mr. Hedlund stated on multiple occasions a bona fide claim of right to be present which negated the *mens rea* or criminal intent required under clearly established Virginia law;

d.      An omission that Mr. Hedlund's demonstration was perfectly legal and consistent with the guidelines set forth by the Department of General Services regulations.

e.      An omission that neither the law nor the Department of General Services regulations gave any person the authority to arrest and charge Mr. Hedlund for trespass for demonstrating in the manner in which he was demonstrating.

---

[18] **Exhibit 13**

f.      An omission that the motivation for the arrest was the content of the sign, and not the lack of the permit.

g.      An omission that Mr. Hedlund was arrested on a legal thoroughfare.

h.      A positive statement that Mr. Hedlund needed a permit.

i.      A positive statement that Mr. Hedlund refused to leave after being informed of this requirement.

75.    Under these circumstances no reasonably officer would believe that the arrest or warrant was supported by probable cause, notwithstanding the magistrate's issuance thereof.

76.    Mr. Hedlund committed no crime in the presence of any of the defendants when he was arrested at the sidewalk at the Demonstration Sight.

77.    During this exchange, Defendant Enz failed to intervene to correct the material misstatements of fact, or to supplement the narrative with the material facts that Defendant Wright had omitted despite having personal knowledge of the same, and being aware that the misstatements of fact and the omissions would be material to the Magistrate's determination.

78.    Based on this affidavit, Mr. Hedlund was arrested, booked, and charged with criminal trespass under Virginia Code § 18.2-119 which in turn forced Mr. Hedlund to retain counsel.

79.    On or around date March 14, 2022, the commonwealth's attorney *nolle prossed* the charges, and thus the matter ended in a manner not unfavorable to Mr. Hedlund.

80.    In his successful criminal defense, Mr. Hedlund was forced to appear in court no less than three times and spend $2,500.00 on his criminal defense attorney.

## **STATEMENTS FROM THE DEFENDANTS – OFFICIAL PAPERWORK.**

81.     Three (3) days after their unlawful actions, on Monday, January 17, 2022, the Capitol Police Department, knowing that they had violated Mr. Hedlund's clearly established First and Fourth Amendment rights, held a meeting to discuss their next steps in order cover up their unlawful actions.[19] In particular they discussed what occurred, their likely exposures, and how to draft their narratives, as required by both law and policy, in such a way as to attempt to limit any legal exposure that the Virginia Capitol Police defendants were going to face.

82.     As a result of this meeting, Defendant Wright produced the following Officer Narrative attached hereto as **Exhibit 15**.

83.     As a result of this meeting, Defendant Tolbert produced the following Officer Narrative attached hereto as **Exhibit 11**.

84.     As a result of this meeting, Defendant Mulheim produced the following Officer Narrative attached hereto as **Exhibit 16**.

85.     The day after this meeting, on January 18, 2022 at 10:34 AM, and consistent with this meeting, Defendant Mulheim reached out to Defendant Gill via e-mail and asked her to produce a statement.[20]  Instead of answering, two minutes later, on January 18, 2022 at 10:36 AM Defendant Gill forwarded the e-mail to Joseph Damico[21] asking for direction.[22]  Four minutes later, Joseph Damico responded to Defendant Gill, telling her that "[Department of General Services is] scheduling a meeting with [Defendant Pike] and his leadership team and [Department of General Services'] leadership team and attorneys to discuss the matter.  Tell

---

[19]  **Exhibit 14**
[20] **Exhibit 17**.
[21] Joseph Damico was at the time the Director of the Department of General Services.
[22] **Exhibit 17**.

[Defendant Mulheim] that your preference is to have the leadership meeting first, then you can provide your statement."[23]

86.     Consistent with Joseph Damico's instruction, Defendant Gill refused to provide Defendant Mulheim with a statement.

87.     On Friday, January 21, 2022, at 8:00 AM this meeting occurred.[24] Present were Defendants Sykes, Gill, and Pike, Joseph Damico, Dena Potter, and Attorneys' General Hutchins, Lants, and Surface Burks.[25]

88.     This meeting also led the Department of General Services, through Joe Damico, and the Capitol Police through Defendant Pike to attempt to change the language of the law and regulations of Department of General Services via the budget amendment, particularly that of §4-5.11, which would have changed the definition of "event" in the DGC regulations to include actions "by one or more individuals that involve the communication or expression of views or ideas having the effect, intent, or propensity to provoke…"   This budget amendment failed.

**CHILLING**

89.     As a result of all of the actions of the defendants, the confrontation, the threats, the assault, the battery, the arrest, the false imprisonment, the malicious prosecution and the collusion and coverup, jointly and severally, as well as the knowledge of the collusion and attempts to cover up the unlawful actions of the defendants, Mr. Hedlund has experienced

---

[23] **Exhibit 17**.
[24] **Exhibit 14.**
[25] One of the products of this meeting appeared to be an attempt to change the law such that DGS *could* require a permit for a single demonstrator on DGS property, which was attached as a rider to Virginia's budget bill, which is an uncodified appropriation law.  **Exhibit 18**.  The redlines are the changes that Virginia Capitol Police and DGS proposed to the existing law.  Lt. Governor Winsome Sears as a tiebreaker vetoed the changes as a tiebreaker in a legislative session.

reticence in full and robust 1st Amendment activities and fear of reprisals, chilling his 1st Amendment rights and activities.

## DAMAGES

90.     As a direct and proximate the Defendants' conduct Mr. Hedlund suffered the following:

   a.  Constitutional injuries in the form of a violation of his First and Fourth Amendment Rights.

   b.  Chilled protected constitutional speech, both in the form of refraining from demonstrating for a time, as well as refraining from filing this law suit out of fear of subsequent retaliation via reinitiating of the *nolle prossed* trespassing charges in retaliation for filing the civil action.

   c.  Bodily injuries he sustained pursuant to the handcuffing, the grabbing, the seizure, and the detention.  This includes but is not limited to lasting shoulder pain and nerve damage to and numbness in his right hand and wrist and lasting pain in his left hand – all from the arrest and handcuffing.

   d.  A loss of freedom of movement and bodily autonomy during the arrest, the booking, and the mandated court appearances over the course of the criminal trial.

   e.  Substantial inconvenience caused by the criminal charges, the criminal process, and the chill to his protected First Amendment activities.

   f.  Property damage.

   g.  Mental anguish and a loss of faith in American law enforcement.

   h.  Harm to his reputation pursuant to being arrested, charged, and tried for criminal trespass.

     i.    Legal bills expended in clearing his name from the trespassing charges.

     j.    Legal bills he incurred during the trespassing trial and those he will reasonably be

          expected to incur in the future getting such charges expunged from his record.

### CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEIZURE, ILLEGAL ARREST
**Seeking Compensatory and Punitive Damages**
**Against Defendants Mulheim, Wright, Enz, and Tolbert.**

91.    Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding

paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

92.    It is axiomatic, and clearly established law, that an arrest without probable cause

is an unlawful arrest, violative of the Fourth Amendment, *e.g., McAfee v. Boczar*, 738 F.3d 81,

87 (4th Cir. 2013); *Miller v. Prince George's Cty*. 475 F.3d 621, 627 (4th Cir. 2007) and all who

stand by and fail to intervene are likewise liable. *E.g., Randall v. Prince George's Cty.* 302 F.3d

188, 204 (4th Cir. 2002);

**Defendant Mulheim**

93.    Defendant Mulheim had actual knowledge, indeed had the Department of General

Services paperwork in his hand that, in plain language, stated that Mr. Hedlund did not need a

permit to demonstrate in the manner in which he was demonstrating.

94.    If Defendant Mulheim did not have this *actual* knowledge, that is due wholly to

his unreasonable failure to read the first two pages of the document he was using to allege to Mr.

Hedlund that he needed a permit.

95.    Thus, whatever Defendant Mulheim's motivations were, it could not have been to

see justice done, to uphold the law, or to punish the guilty.  Rather they were motivated by the

animus he felt towards Mr. Hedlund and the Sign and a desire to follow the orders of Defendants Pike and Mercer.

96.     However, Defendant Mulheim, after threatening Mr. Hedlund with arrest for demonstrating without a permit (which Mr. Hedlund did *not* need) Defendant Mulheim proceeded to arrest Mr. Hedlund; that is physically detain him, place him in handcuffs, seize his personal property, search him, and turn him over to Defendant Wright for to be transported to the Richmond Justice Center for the warrant and booking.

97.     Contemporaneously with the arrest, Defendant Mulheim seized Mr. Hedlund's phone and removed it from him.  Subsequent to the arrest Defendant Mulheim seized Mr. Hedlund's Sign and placed it in property of the Government.

98.     Regardless of whether or not the magistrate issued the warrant, under the circumstances of the arrest, no reasonable officer in the position of Defendant Mulheim would have believed that the warrant was supported by probable cause.

99.     At no time after the warrant had been obtained, did Defendant Mulheim approach the Commonwealth's Attorney to let him know about what had happened or the actual permitting requirements in force at the Patrick Henry Building on that day and thus permitted the prosecution to move forward.

**Defendant Wright**

100.     Defendant Wright had actual knowledge, that Mr. Hedlund did not need a permit to demonstrate in the manner in which he was demonstrating.

101.     If Defendant Wright did not have this *actual* knowledge, that is due wholly to his unreasonable failure to read the first two pages of the document Defendant Mulheim was using

to allege to Mr. Hedlund that he needed a permit while Defendants Mulheim and Wright were driving to threaten and ultimately arrest Mr. Hedlund.

102.    Thus, whatever Defendant Wrights's motivations were, it could not have been to see justice done, to uphold the law, or to punish the guilty.  Rather they were motivated by the animus he felt towards Mr. Hedlund and the Sign.

103.    However, Defendant Wright, after threatening Mr. Hedlund with arrest for demonstrating without a permit (which Mr. Hedlund did *not* need) Defendant Wright proceeded to arrest Mr. Hedlund; that is physically detain him, place him in handcuffs, seize his personal property, search him, and transport him to the Richmond Justice Center for the warrant and booking.

104.    Regardless of whether or not the magistrate issued the warrant, under the circumstances of the arrest, no reasonable officer in the position of Defendant Mulheim would have believed that the warrant was supported by probable cause.

105.    However, at the magistrate and to ensure that he obtained a warrant, upon information and belief, Defendant Wright knowingly made the following materially false statements of fact and omissions to the magistrate knowing that the magistrate would rely upon them to issue the warrant:

> a.    An omission that Mr. Hedlund was not required under law or Department of General Services regulations to have a permit in order to demonstrate with his Sign at the Demonstration area in the manner in which Mr. Hedlund was demonstrating.

> b.    An omission that the Department of General Services regulations requiring a permit applied only to groups of 10 or more persons and that Mr. Hedlund was there by himself.

> c.    An omission that Mr. Hedlund stated on multiple occasions a bona fide claim of right to be present which negated the *mens rea* or criminal intent required under clearly established Virginia law;

d.      An omission that Mr. Hedlund's demonstration was perfectly legal and consistent with the guidelines set forth by the Department of General Services regulations.

e.      An omission that neither the law nor the Department of General Services regulations gave any person the authority to arrest and charge Mr. Hedlund for trespass for demonstrating in the manner in which he was demonstrating.

f.      An omission that the motivation for the arrest was the content of the sign, and not the lack of the permit.

g.      An omission that Mr. Hedlund was arrested on a legal thoroughfare.

h.      A positive statement that Mr. Hedlund needed a permit.

i.      A positive statement that Mr. Hedlund refused to leave after being informed of this requirement.

106.    Based on these statements and omissions the magistrate issued the warrant, and no reasonable officer in Defendant Wrights position would have believed that the warrant so obtained was actually supported by probable cause.

107.    At no time after the warrant had been obtained, did Defendant Wright approach the Commonwealth's Attorney to let him know about what had happened or the actual permitting requirements in force at the Patrick Henry Building on that day and thus permitted the prosecution to move forward.

**Defendant Enz**

108.    Defendant Enz had actual knowledge that Mr. Hedlund needed no permit to demonstrate with his Sign in at the demonstration area in the manner in which he demonstrated.

109.    If Defendant Enz did not have this *actual* knowledge, that is due wholly to his unreasonable failure to do even an elementary investigation of the regulations and the law, especially as they were being circulated amongst the other defendants and especially as Defendant Enz had actual knowledge that the defendant's actions were motivated by their personal animus related to the Sign.

110.     Thus, whatever Defendant Enz's motivations were, it could not have been to see justice done, to uphold the law, or to punish the guilty.

111.     Yet Defendant Enz participated in this plan to remove Mr. Hedlund from the premises under pain of arrest for trespass, with full knowledge that Mr. Hedlund was likely to be arrested and then when Defendants Wright and Mulheim actually arrested Mr. Hedlund in the presence of Defendant Enz, Defendant Enz initially stood idly by and did nothing to intervene and then directly participated by escorting Mr. Hedlund to the Richmond Justice Center.

112.     Further, Defendant Enz remained silent, that is he did not intervene when Defendant Wright made material omissions and misstatements of fact to the magistrate in order to obtain the warrant.

113.     At no time after the warrant had been obtained, did Defendant Enz approach the Commonwealth's Attorney to let him know about what had happened or the actual permitting requirements in force at the Patrick Henry Building on that day and thus permitted the prosecution to move forward.

**Defendant Tolbert**

114.     Defendant Tolbert had actual knowledge that Mr. Hedlund needed no permit to demonstrate with his Sign in at the demonstration area in the manner in which he demonstrated. Defendant Tolbert had confirmed the same in an interaction with Mr. Hedlund that same day.

115.     If Defendant Tolbert did not have this *actual* knowledge that neither the law or the regulations required Mr. Hedlund to have a permit, that is due wholly to his unreasonable failure to do even an elementary investigation of the regulations and the law, especially as they were being circulated amongst the other defendants and especially as Defendant Tolbert had

35

actual knowledge that the defendant's actions were motivated by their personal animus related to the Sign.

116.    Yet Defendant Tolbert participated in this plan to remove Mr. Hedlund from the premises under pain of arrest for trespass, with full knowledge that Mr. Hedlund was likely to be arrested and then when Defendants Wright and Mulheim actually arrested Mr. Hedlund in the presence of Defendant Tolbert, Defendant Tolbert stood idly by and did nothing to intervene.

117.    At no time after the warrant had been obtained, did Defendant Tolbert approach the Commonwealth's Attorney to let him know about what had happened or the actual permitting requirements in force at the Patrick Henry Building on that day and thus permitted the prosecution to move forward.

118.    Thus, Mr. Hedlund is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 USC § 1983 and 1988 for the Defendant Mulheim, Wright, Enz, and Tolbert's violation of Mr. Hedlund's clearly established Fourth Amendment right to be free of illegal and unreasonable seizures of his person and his property and arrests unsupported by probable cause.

119.    Further, the circumstances demonstrate that Defendants Mulheim, Wright, Enz, and Tolbert's actions were done intentionally, maliciously, and in a manner demonstrating a callous indifference to Mr. Hedlund's protected rights.  Therefore, the Defendants are liable to Mr. Hedlund for punitive damages for the unreasonable seizures of his person and his property and the arrest unsupported by probable cause.


**<u>COUNT II –VIOLATION OF THE FOURTH AMENDMENT – EXCESSIVE FORCE</u>**
**Seeking Compensatory and Punitive Damages**
**Against Defendants Mulheim, Wright, Enz, and Tolbert.**

120.    Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

121.    It is axiomatic that any amount force used pursuant to an illegal arrest is excessive and violates the Fourth Amendment.  *Clem v. Corbeau*, 284 F.3d 543, 545-47 (4th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 848, 853 (4th Cir. 2001) (finding the lack of probable cause under the first *Graham* factors almost dispositive on claims of unreasonable force).

122.    The Defendants Mulheim and Wright directly deployed force that was objectively unreasonable against Mr. Hedlund under the circumstances as his arrest was unreasonable and illegal under clearly established law.

123.    As the initial seizure was illegal, any touching that Defendant Mulheim or Defendant Wright did to Mr. Hedlund's person was as a matter of law unreasonable.

124.    Such touching included, but are not limited to, grabbing him, handcuffing him, touching him pursuant to the search, touching him to place him in the police vehicle, and searching him again while at the Richmond Justice Center.

125.    At the time that the Defendants used this force on Mr. Hedlund, they lacked probable cause to believe that Mr. Hedlund had committed *any* crime, and they lacked even a reasonable articulable suspicion that Mr. Hedlund had committed any crime, the documents that Defendant Mulheim had in his possession demonstrated this fact.

126.    At the time that the Defendants used this force on Mr. Hedlund, Mr. Hedlund had given the Defendants no signals, taken no actions, or made threats, nor done anything that would have led a reasonable person to believe that Mr. Hedlund posed a threat to the Defendants.  Quite the contrary, all Mr. Hedlund had done was appropriately ask the Defendants questions about

their threats and then had the courage to stand upon his rights in the face of overwhelming and illegal state abuses.

127.    Defendants Tolbert and Enz were present during this unlawful use of force, and the circumstances were such that a reasonably well-trained officer would have known that the arrest, and there for the force violated Mr. Hedlund's clearly established rights under the Fourth Amendment.

128.    To the extent that either of the Defendants did not personally and actively participate in any particular discrete use of force, the use of force under these circumstances violated Mr. Hedlund's clearly established constitutional rights to be free from excessive force, the Defendant knew that the use of force would and did violate Mr. Hedlund rights, and such Defendant failed to intervene and stop it.

129.    Thus, Mr. Hedlund is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1983 and 1988 jointly and severally against the Defendants for their violation of Mr. Hedlund's clearly established Fourth Amendment right to be free of excessive force.

130.    Further, the circumstances demonstrate that the Defendants actions were done intentionally, maliciously, and in a manner demonstrating a callous indifference to Mr. Hedlund's protected rights.  Therefore, the Defendants are liable to Mr. Hedlund for punitive damages for their objectively unreasonable use of force.

## COUNT III – VIOLATION OF THE FOURTH AMENDMENT (ILLEGAL SEARCH)
### Seeking Compensatory and Punitive Damages
### Against Defendants Mulheim, Wright, Tolbert, and Enz.

131.    Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

132.    Defendant Mulheim, with the knowledge, consent, and participation of Defendant Wright, searched Mr. Hedlund after Defendants Mulheim and Wright put Mr. Hedlund into handcuffs.

133.    This search was done in the presence of Defendants Tolbert and Enz, who although they had the chance to attempt to intervene, failed to do so notwithstanding the illegality of the search as set forth by clearly established law.

134.    At no time did the any of the defendants have probable cause to believe that Mr. Hedlund had committed the crime of criminal trespass as he was arrested on the sidewalk, a public thoroughfare, and the regulations of the Department of General Services clearly stated that a condition precedent of the permit requirement was that the demonstration be ten persons or larger and further the defendants were aware of Mr. Hedlund's asserted bona fide claim of right which negated a requisite criminal intent necessary for criminal trespass.

135.    Thus, Mr. Hedlund is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1983 and 1988 jointly and severally against the defendants Mulheim, Wright, Tolbert, and Enz for their violation of Mr. Hedlund's clearly established Fourth Amendment rights to be free of an unreasonable search.

136.    Further, the circumstances demonstrate that defendant Mulheim, Wright, Tolbert, and Enz's actions were done intentionally, maliciously, and in a manner demonstrating a callous indifference to Mr. Hedlund's protected rights.  Therefore, defendants Mulheim, Wright, Tolbert, and Enz are liable to Mr. Hedlund for punitive damages for their objectively unreasonable warrantless search in violation of Mr. Hedlund's clearly established right to be free from unreasonable searches.

## COUNT IV – VIOLATION OF THE FIRST AMENDMENT
### Seeking Compensatory and Punitive Damages
### Against Defendants Mulheim, Wright, Tolbert, and Enz

137.     Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

138.     As the Defendants Tolbert, and Mulheim admitted, the issue was the content of Mr. Hedlund's Sign, which was expressive conduct and content on matters of public concern protected by the First Amendment, as was the place where Mr. Hedlund chose to demonstrate – that is outside of the Patrick Henry Building in Richmond Virginia, a location where Mr. Hedlund believed that the outgoing governor, Ralph Northam, one of the intended targets of his one-man demonstration, was likely to see the Sign.  It was also expressive activity protected by the First Amendment.

139.     Contrary to these rights, the Defendants engaged in conduct in an attempt to censor Mr. Hedlund, and to prevent him from exercising his right to free expression, to petition the Government for a redress of grievances, and in retaliation for Mr. Hedlunds for the speech and his attempts to stand on his rights.  Their conduct had such an effect.

140.     Defendants Tolbert, Mulheim, and Wright, armed and in uniform, approached Mr. Hedlund and told him falsely that he needed to leave because he did not have a required permit. This would have chilled the speech of a reasonable, similarly situated person of ordinary firmness.

141.     Defendant Enz, with knowledge of the unlawful nature of the actions of the defendants, located within feet of these actions had the chance to attempt to intervene, but wholly failed to take any steps to intervene.

142.    Defendants Muleim and Wright, armed and in uniform, told Mr. Hedlund that since he did not have a permit, if he did not leave, they would arrest him.  This would chill the speech of a reasonable, similarly situated person of ordinary firmness.

143.    Defendants Enz and Tolbert, with knowledge of the unlawful nature of the actions of the defendants, were within feet of these threats, had the opportunity to intervene, and failed to take those required steps.

144.    The Defendants Mulheim, Wright, and Enz ultimately arrested Mr. Hedlund, on a thoroughfare, for the content of the Sign and location of the Demonstration, handcuffed him, searched him, took him to jail, and had him charged with trespass.  This would have chilled the speech of a similarly situated person of ordinary firmness, and in fact chilled the speech of Mr. Hedlund, who was, after the incident, both hesitant to continue his demonstrations, and was even afraid for over a year to file this action against the Defendants for fear that the Defendants would be able to convince the Commonwealth's Attorney to reinstitute the *nolle prossed* trespassing charges in the event that Mr. Hedlund filed this suit.

145.    To the extent that either Defendant Mulheim, Wright, Tolbert, or Enz did not personally and actively participate in any particular, discrete threats knowingly intended to chill Mr. Hedlund's exercise of his First Amendment rights , such threats and actions for such a purpose under these circumstances violated Mr. Hedlund's clearly established constitutional rights that the First Amendment protects, such Defendant knew that the actions would and did Mr. Hedlund's rights, and such Defendant failed to intervene and stop it.

146.    At no time prior to these actions did the defendant Tolbert, Enz, Mulheim, and Wright have probable cause to believe that Mr. Hedlund needed a permit, nor did they have

probable cause to believe that Mr. Hedlund was criminally trespassing because he lacked a

permit, nor would a reasonably well-trained officer in any of their positions.

147.    Further, and even if they had probable cause, which is denied, they understood

that the desire and plan to retaliate against Mr. Hedlund for the sign and the demonstration was

formed and hatched *prior* to any person having probable cause to believe that Mr. Hedlund had

committed a crime.

148.    Thus, Mr. Hedlund is entitled to compensatory damages, costs, and attorney's

fees pursuant to 42 U.S.C. § 1983 and 1988 jointly and severally against the Defendants

Mulheim, Tolbert, Enz, and Wright for their violation of Mr. Hedlund's clearly established First

Amendment rights.

149.    Further, as the Defendant's conduct violated Mr. Hedlund's clearly established

rights, and was done intentionally, maliciously, and in a manner demonstrating a callous

indifference to Mr. Hedlund's protected rights.  Thus, the Defendants are liable to Mr. Hedlund

for punitive damages for the violations of Mr. Hedlund's clearly established First Amendment

rights.

<u>**COUNT V – CONSPIRACY TO VIOLATE CIVIL RIGHTS**</u>
**Seeking Compensatory and Punitive Damages**
**Against All Defendants**

150.    Mr. Hedlund incorporates the previous paragraphs of this complaint herein by

reference.

151.    If two or more persons in any State or Territory conspire or go in disguise on the

highway or on the premises of another, for the purpose of depriving, either directly or indirectly,

any person …the equal protection of the laws, or of equal privileges and immunities under the

laws…in any case of conspiracy set forth in this section, if one or more persons engaged therein

do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.  42 USC § 1985(3).

152.    The purpose of this conspiracy was to deprive Mr. Hedlund of the privileges and immunities established by the First and Fourth Amendment of the Constitution of the United States made applicable to the states themselves via the Fourteenth Amendment, as well as to deprive Mr. Hedlund of the equal protection of the laws established by the First and Fourth Amendments to the Constitution of the United States made applicable to the states by the Fourteenth Amendment to the Constitution of the United States of America for the purposes of the censoring of and retaliating against Mr. Hedlund for his protected First Amendment expressive activities.

**The Conspirators**

153.    Between January 14, 2022, at around 9:03 AM through and ending on March 14, 2023 on or around 9:30 AM defendants Mercer, Mulheim, Gill, Sykes, Wright, Tolbert, Enz, and Pike knowingly conspired amongst each other to deprive Mr. Hedlund of both the equal protection of the laws and the privileges and immunities under the law.

154.    Particularly:

a.    **Robert Mercer**.  Defendant Mercer, and the Chief of Staff for the outgoing administration, was willing to retaliate and censor Mr. Hedlund's protected first Amendment Activity, due to the fact that Mr. Mercer did not like the political content of Mr. Hedlund's sign which, in part, was targeting Robert Mercer's boss, outgoing governor Ralph Northam.  Mr.

Mercer was willing to threaten Mr. Hedlund with an illegal arrest for criminal trespass knowing that the DGS regulations did not require permitting in this instance, a violation of Mr. Hedlund's clearly established First Amendment Rights, and was willing to have Mr. Hedlund arrested for criminal trespass if he did not leave, knowing that neither the law nor the DGS regulations provided a legal justification for such threats or arrest and understanding that under the circumstances the conduct would violate Mr. Hedlund's clearly established First and Fourth Amendment Rights.

b.     **Steven Pike**. Defendant Pike, the Chief of the Capitol Police Department was willing to follow Defendant Mercer's orders to remove Mr. Hedlund due to the content of his sign, and due to the fact that Mr. Hedlund had previously and appropriately exercised his rights to refuse unlawful orders of the Capitol Police to leave the Demonstration Area.  He was willing to order his officers to threaten Mr. Hedlund with a criminal trespass charge if he did not leave the area with *scienter* that neither the law or the regulations required Mr. Hedlund to have a permit for his demonstration, and was willing to order his officers to have Mr. Hedlund arrested for criminal trespass if he refused to leave, with *scienter* that such arrest was not supported by either the law or DGS regulations and would violate Mr. Hedlund's clearly established First and Fourth Amendment rights.

c.     **Mark Sykes**:  Defendant Sykes, the Deputy Chief of the Virginia Capitol Police took a personal dislike to Mr. Hedlund's Sign, as well as felt personal animosity towards Mr. Hedlund due to their interaction occurring on Wednesday, January 12, 2022, after being informed that his other co-conspirators wanted to remove Mr. Hedlund from the Demonstration site due to the content of the Sign, was willing to work with his other conspirators, particularly Defendant's Pike, Mercer, and Gill, to develop and deploy a plan to remove Mr. Hedlund using

44

the false claim that Mr. Hedlund needed a permit, threaten Mr. Hedlund with a criminal trespassing charge if he did not leave knowing that neither the law nor the DGS regulations provided a legal justification for their actions and knowing that such actions would violate Mr. Hedlund's clearly established First and Fourth Amendment rights.

       d.    **Sandra Gill**:  Defendant Gill, the Deputy Director of the Department of General Services, took personal offence at Mr. Hedlund's Sign, and due to this personal offense, was willing to work with Defendants Mercer, Mulheim, and Hedlund to develop the plan to remove Mr. Hedlund with the false allegations of a permit requirement and a trespass charge, to have Mr. Hedlund charged with criminal trespass if he did not leave, was willing to research and produce the DGS permitting documents to be used in this process, and in fact, did research and produce the DGS regulations and paperwork and forwarded them to Defendant Sykes knowing the purpose to which they would be put – that is to remove Mr. Hedlund due to the contents of the Sign, or to have him arrested and criminally charged.  She was aware that neither the law nor the DGS regulations provided a legal justification for such a course of action, and that such actions would violate Mr. Hedlund's clearly established First and Fourth Amendment rights.

       e.    **Matthew Mulheim**:  Defendant Mulheim, as a 1st Sargent in the Capitol Police Department, was aware that Mr. Hedlund was being targeted because of the content of the Sign, was willing to follow the orders of Defendants Mercer and Pike to use the false statement that a permit was required to force Mr. Hedlund to discontinue his demonstration.  Matthew Mulheim knew that the actions were motivated due to the content of the Sign and had *scienter* that neither the law nor the DGS regulations required Mr. Hedlund to have a permit for what he was doing. Defendant Mulheim was willing to threaten Mr. Hedlund with an arrest if Mr. Hedlund did not vacate the property and was willing to arrest and have Mr. Hedlund charged with criminal

trespass regardless of whether Mr. Hedlund was on the property or on a thoroughfare if Mr. Hedlund refused to discontinue his demonstration.  He was willing to do this, understanding that neither the law nor the DGS regulations provided a legal justification for such actions, and that such actions would violate Mr. Hedlund's clearly established First and Fourth Amendment rights.

       f.    **Garrison Wright**:  Defendant Wright, as an officer in the Department of Capitol Police, was aware that the motivation for trying to remove Mr. Hedlund was due to the content of his Sign, was willing to follow the orders of Defendants Mercer and Pike, and accompany Defendant Mulheim to confront Mr. Hedlund, and to use the false statement that a permit was required to force Mr. Hedlund to discontinue his demonstration.  Defendant Garrison knew that the actions were motivated due to the content of the Sign and had *scienter* that neither the law nor the DGS regulations required Mr. Hedlund to have a permit for what he was doing.  Defendant Garrison was willing to threaten Mr. Hedlund with an arrest if Mr. Hedlund did not vacate the property and was willing to arrest and have Mr. Hedlund charged with criminal trespass regardless of whether Mr. Hedlund was on the property or on a thoroughfare if Mr. Hedlund refused to discontinue his demonstration.  Further, Defendant Wright was willing to transport Mr. Hedlund to the Richmond Justice Center and make such statements to the magistrate as were necessary to obtain a warrant, upon information and belief, including omitting relevant information and including false statements that was provided to the magistrate so to influence the magistrate's probable cause analysis. He was willing to do this, understanding that neither the law nor the DGS regulations provided a legal justification for their actions, and knowing that such actions would violate Mr. Hedlund's clearly established First and Fourth Amendment rights.

g.      **Michael Enz**:  Defendant Enz, an officer with the Division of Capitol Police, was aware that the motivation to remove Mr. Hedlund was due to the content of the Sign.  He had *scienter* that no permit was necessary and that Mr. Hedlund's activities were legal and protected by the First Amendment.  He was willing to participate, along with Defendant Mulheim and Defendant Wright, directly in attempting to remove Mr. Hedlund, due to the content of the Sign, using false statements of law that Mr. Hedlund's activities required a permit, and then to arrest Mr. Hedlund and participate in his transportation to the Richmond City Justice Center and to the Magistrate.  He was further willing to remain silent as defendant Wright made material omissions and false statements of fact to the magistrate in order to obtain the arrest warrant.  He was willing to do this, understanding that neither the law nor the DGS regulations provided a legal justification for their actions, and knowing that such actions would violate Mr. Hedlund's clearly established constitutional rights.

h.      **Nicholas Tolbert**: Defendant Tolbert, an officer with the Division of Capitol Police, was aware that the motivation to remove Mr. Hedlund was due to the content of the Sign. He had *scienter* that no permit was necessary, and that Mr. Hedlund's activities were protected by the First Amendment.  He was willing attempt to remove Mr. Hedlund from the property by alleging that Mr. Hedlund needed a permit.  He was willing, when directed by, *inter alia*, Defendants Pike and Sykes, to be present when Defendants Mulheim and Wright arrested Mr. Hedlund for criminal trespass and was willing to not intervene during the process of that arrest, understanding that neither the law nor the DGS regulations provided a legal basis for the arrest. He was willing to do this, understanding that neither the law nor the DGS regulations provided a legal justification for their actions, and knowing that such actions would violate Mr. Hedlund's clearly established First and Fourth Amendment rights.

**Purpose of the Conspiracy**

155.    The purpose of this conspiracy was to remove Mr. Hedlund from the public areas abutting Capitol Square using a plan that Defendants Mercer, Pike, Sykes, and Gill had developed regarding the false statement that Mr. Hedlund needed a permit.  The motivation for removing Mr. Hedlund from the Demonstration Area abutting Capitol Square was due to the specific content of Mr. Hedlund's Sign, protected expressive First Amendment Activity, with which the Conspirators did not agree, that is the political message of Mr. Hedlund's Sign and peaceful demonstration: his opposition to the outgoing Governor and to abortion.

156.    The defendants conspired to this, notwithstanding the legality of Mr. Hedlunds actions, and notwithstanding the fact that the defendants had no legal right to attempt to remove Mr. Hedlund, by alleging – contrary to law and regulations – that Mr. Hedlund's demonstration required a permit, demanding that he leave the area, threatening him with a criminal trespass charge if he refused to leave, and ultimately to arrest him for criminal trespass if he refused to leave.

157.    The conspirators did this knowing that neither the law nor the regulations required Mr. Hedlund to have a permit, and to the extent that any particular conspirator did not have actual knowledge, it was due to their own intentional and willful ignorance.  However, a reasonable person and officer would have known that neither the law nor the regulations required a permit.

158.    The conspirators did this knowing that Mr. Hedlund was asserting a bona fide claim of right which under well established Virginia law negated the *mens rea* or criminal intent necessary for a conviction for criminal trespass under Va Code § 18.2-119.

**The Equal Protection of Laws and Privileges and Immunities**

159.    The right to petition the government for a redress of grievances as well as the right to freely express speech, subject to reasonable time, place, and manner restrictions, without government interference is among the privileges and immunities established by the Constitution of the United States of America. *See, e.g., United States v. Cruikshank*, 92 U.S. 542 (1875).

160.    The right to not be subject to unlawful arrest and prosecution, unreasonable seizure, unreasonable search, and retaliation for protected first amendment activities, are all privileges and immunities afforded by the Constitution of the United States of America as well as actions from which that the laws protect each and every American.  *See, e.g., United States v. Cruikshank*, 92 U.S. 542 (1875).

161.    At all times complained of herein, Mr. Hedlund was engaged in the protected exercise of his First Amendment activities, and like all Americans, was protected by law against content-based censorship of those ideas, as well as from arbitrary, unreasonable, and unjustified searches, seizures and criminal prosecutions.

**Manner and Means of the Conspiracy**

162.    The manner and means of the conspiracy was, succinctly put, to retaliate against and censor Mr. Hedlund for the particular content of his Sign, to allege that he needed a permit to demonstrate with the Sign at the Demonstration Site on that particular day, and use the allegation of the permit to give weight to a threat that the law would permit them to arrest Mr. Hedlund with criminal trespass if he did not leave.

163.    The Conspirators all were willing to follow through with the arrest in order to remove Mr. Hedlund and his Sign from the Demonstration Site, knowing that they lacked probable cause to believe he needed a permit, and thus knowing they had no cause remove him

under pain of criminal trespass or charge him with criminal trespass.  Further, and to the extent

that any conspirator developed such probable cause, which is denied, the plan to remove Mr.

Hedlund in retaliation for his protected First Amendment activities was developed by the

Conspirators *prior* to any single conspirator having developed probable cause.

**Actions Taken in Furtherance of the Conspiracy**

164.    As stated in above, the actions the conspirators took in furtherance of their

conspiracy are as follows:

165.    After Defendant Mercer saw the content of Mr. Hedlund's sign, and after he,

Pike, and Gill determined to try to remove Mr. Hedlund by claiming that he needed a permit and

threaten him with arrest or ultimately arrest him, on January 14, 2022 at around 9:12 AM,

Defendant Gill confronted Mr. Hedlund.

166.    Defendant Gill refused to identify herself or provide any bona fides to Mr.

Hedlund, and told him that he needed a permit, or needed to leave if Mr. Hedlund's

demonstration was not permitted.   He returned inside the Patrick Henry Building and informed

Defendant Talbert that, due to the contents of the Sign, Mr. Hedlund needed to be removed.

When Mr. Hedlund stood on his rights, Defendant Gill retreated back into the Patrick Henry

Building where she conferred with her co-defendants, particularly Mercer and Pike who had her

produce the regulations via hyper-link so that they may be used to attempt to remove Mr.

Hedlund again and add an air of legitimacy to their attempt.

167.    After Defendant Gill's failed attempt to remove Mr. Hedlund, during these

discussions, Defendant Sykes asked Defendant Gill to forward to him the Department of General

Services permitting paperwork via e-mail.

168.    On or around 9:28 AM on Friday, January 14, 2022, Defendant Gill forwarded the hyperlink that at the time contained the regulations and paperwork to Defendant Sykes.

169.    On or around 9:29 AM, on Friday, January 14, 2022, Defendant Sykes forwarded the same to Defendant Pike with the message "FYSA" meaning "for your situational awareness" and Defendant Pike responded with "Received."

170.    Defendant Pike in the interim ordered Defendants Tolbert and Enz to approach Mr. Hedlund again, telling him that he needed a permit, and that since he did not have a permit, that he needed to leave.  When Mr. Hedlund stood on his rights and pointed out that previously Defendant Tolbert (in the presence of Defendant Enz) stated he did not need a permit, just not to enter Capitol Square, Defendants Tolber and Enz retreated again.

171.    After this failed attempt to remove Mr. Hedlund, Defendant Pike ordered Lt. Reavis to print the regulations out that Defendant. Gill had circulated, consistent with the conspiracy, and then ordered Defendants Mulheim, Wright, Tolbert, and Enz to either remove Mr. Hedlund or arrest him.

172.    On or around 9:37 AM on January 14, 2022, two other officers, Defendant Mulheim and Defendant Wright, arrive at the Demonstration Site in an SUV and approached Mr. Hedlund.

173.    Defendant Mulheim, in the presence of Defendants Wright, Tolbert, and Enz, presented Mr. Hedlund with a stack of papers Defendant Mulheim represented was the permitting regulations which required Mr. Hedlund to have a permit.

174.    Defendant Mulheim also stated that he would send Mr. Hedlund an interlink for the permitting process as well.

175.     Defendant Mulheim then stated that since Mr. Hedlund did not have a permit, he would need to leave and if he did not leave, he would be arrested for criminal trespass.

176.     Mr. Hedlund protested and asked again about the permit.

177.     Defendant Mulheim responded that it was Department of General Services regulations and stated that he was giving Mr. Hedlund one more time, and if he refused to leave, he would be arrested for criminal trespass.

178.     Mr. Hedlund protested his claim of right to be present, that there were no signs at the Demonstration Site regarding demonstrations and trespass (unlike Capitol Square), and Defendant Mulheim stated that the regulations were at dgs.virginia.gov and responded to the questions regarding the signs by telling Mr. Hedlund to keep moving as Mr. Hedlund had begun his retreat away from the Demonstration Site towards the sidewalk abutting 12th Street.

179.     Mr. Hedlund again protested that this was a violation of his civil rights, and asked Defendant Mulheim where he should go and Defendant Mulheim directed Mr. Hedlund to either (1) on the other side of 14th Street (two city blocks to the east of the Demonstration Site), (2) the other side of Main Street (two city blocks south of the Demonstration Site), or (3) on areas on 9th street that are not in front of state-owned property (approximately two city blocks to the west of the Demonstration Site).

180.     As Mr. Hedlund approached the gate between the Demonstration Area and the sidewalk of 12th Street, Mr. Hedlund asked Defendant Mulheim whether that was sufficient, and Defendant Mulheim stated "Nope.  All the way across Broad Street" (One city block to the north).

181.     Admirably, Mr. Hedlund refused to yield his constitutional rights any further, and Defendants Mulheim and Wright, and in the presence of Officers Talbert and Enz, arrested Mr.

Hedlund, past the gate, on the sidewalk bordering the Patrick Henry Building and 12th Street. Defendant Mulheim, in plain view of Defendants Wright, Enz, and Tolbert searched Mr. Hedlund and did not read Mr. Hedlund his Miranda rights.

182.    During this arrest, Defendant Wright grabbed his cellphone and threw it to the ground in an effort to end the recording, and also grabbed Mr. Hedlund for the purpose of cuffing him.  Defendant Wright then charged Mr. Hedlund with criminal trespass and took him to the Richmond City Justice Center where Mr. Hedlund was booked.  Defendant Wright again searched Mr. Hedlund at the Richmond City Justice Center.

183.    After arresting Mr. Hedlund, Defendants Wright and Enz transported Mr. Hedlund to the Richmond City Justice Center where Defendant Wright, in the presence of Defendant Enz obtained an arrest warrant for Mr. Hedlund from the Magistrate.

184.    In order to obtain this warrant, upon information and belief, officer Wright failed to tell the Magistrate the following, despite the same being within Defendant Wright's knowledge and which were material to the Magistrates probable cause determination:

i-- that Mr. Hedlund was not required under law or Department of General Services regulations to have a permit in order to demonstrate with his Sign at the Demonstration area in the manner in which Mr. Hedlund was demonstrating.

ii-- that the Department of General Services regulations requiring a permit applied only to groups of 10 or more persons and that Mr. Hedlund was there by himself.

iii-- that Mr. Hedlund stated on multiple occasions a bona fide claim of right to be present which negated the *mens rea* or criminal intent required under clearly established Virginia law;

iv-- that Mr. Hedlund's demonstration was perfectly legal and consistent with the guidelines set forth by the Department of General Services regulations.

v--that neither the law nor the Department of General Services regulations gave any person the authority to arrest and charge Mr. Hedlund for trespass for demonstrating in the manner in which he was demonstrating.

vi--that the motivation for the arrest was the content of the sign, and not the lack of the permit.

vii--that Mr. Hedlund was arrested on a legal thoroughfare.

185.    In order to obtain this warrant, upon information and belief, officer Wright told the Magistrate the following false statements, knowing them to be false and knowing that these false statements material to the Magistrates probable cause determination:

i-- that Mr. Hedlund needed a permit.

ii-- that Mr. Hedlund refused to leave after being informed of this requirement.

186.    Based on this affidavit, Mr. Hedlund was arrested, booked, and charged with trespass and Defendant Wright also issued a barment notice to Mr. Hedlund barring him from any DGS controlled property for one year.

187.    During this exchange, Defendant Enz failed to intervene to correct the material misstatements of fact, or to supplement the narrative with the material facts that Defendant Wright had omitted despite having personal knowledge of the same, and being aware that the misstatements of fact and the omissions would be material to the Magistrate's determination.

188.    At no time after the warrant had been obtained, did any Conspirator approach the Commonwealth's Attorney to let him know about what had happened or the actual permitting requirements in force at the Patrick Henry Building on that day and thus permitted the prosecution to move forward.

189.    Thus, Mr. Hedlund is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1985 and 1988 jointly and severally against all conspirators for their conspiracy to violate, and their subsequent violation in furtherance of the conspiracy of Mr.

Hedlund's clearly established Fourth Amendment rights to be free of an unreasonable search, seizure, use of force, arrest, and his clearly established First Amendment rights.

190.    Further, the circumstances demonstrate that the conspirators' actions were done intentionally, maliciously, and in a manner demonstrating a callous indifference to Mr. Hedlund's protected rights.  Therefore, defendants Mercer, Gill, Pike, Sykes, Mulheim, Wright, Tolbert, and Enz are liable to Mr. Hedlund for punitive damages for their conspiracy.

**COUNT VI – Common Law Assault.**
**Seeking Compensatory and Punitive Damages**
**Defendants Mulheim, Wright, Tolbert, and Enz.**

191.    Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

192.    This is a claim for common law assault.

193.    Defendant Mulheim knowingly, willfully and wantonly, intentionally, directly and/or by being present and explicitly encouraging such behavior, assaulted Mr. Hedlund by, *inter alia*, reaching to grab him to place him in handcuffs, trying to seize his cell phone, reaching to attempt to search Mr. Hedlund, grabbing him, placing him in handcuffs, and grabbing his cell phone.

194.    Defendant Wright knowingly, willfully and wantonly, intentionally, directly and/or by being present and explicitly encouraging such behavior, assaulted Mr. Hedlund by, *inter alia*, reaching to grab him to place him in handcuffs, trying to seize his cell phone, reaching to attempt to search Mr. Hedlund, grabbing him, placing him in handcuffs, and grabbing his cell phone.

195.    Defendant Enz and Tolbert were present at the time of the assault by defendants Mulheim and Wright, and by word, action and/or deed encouraged the same.

196.    Mr. Hedlund was aware of each of these actions, and prior to and as a result of such contact, each put him in reasonable fear of the forthcoming batteries.

197.    In each instance, the Defendants acted with *at least* scienter that their actions were likely to place Mr. Hedlund in reasonable fear of an imminent physical battery, and such actions were designed to elicit such a reaction from Mr. Hedlund.

198.    In each instance, the Defendants lacked any legal justification or excuse for their conduct.  And under these circumstances, the Defendants are not entitled to sovereign immunity. Further as assault is an intentional tort, the doctrine of sovereign immunity does not apply.

199.    In each instance, the defendants did not have a warrant and did not see a misdemeanor committed in their presence, as the DGS regulation requiring permitting of groups of 10 or more did not apply to Mr. Hedlund, he was on a public thoroughfare and his assertion of a bona fide claim of right negated required criminal intent for a criminal trespass under Va Code § 18.2-119. See (Va Code § 19.2-81)(B. Such officers may arrest without a warrant any person who commits any crime in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence.)

200.    These actions were the legal and proximate cause of Mr. Hedlund's damages as complained of herein and thus Mr. Hedlund is entitled to compensatory damages for common-law assault.

201.    Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Mr. Hedlund's rights, and thus punitive damages for common-law assault are warranted.

**COUNT VII – Common Law Battery.**
**Seeking Compensatory and Punitive Damages**
**Against Defendants Mulheim, Wright, Tolbert, and Enz.**

202.    Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

203.    This is a common law claim of battery against the Defendants.

204.    Defendant Mulheim knowingly, willfully and wantonly, intentionally, directly and/or by being present and explicitly encouraging such behavior, battered Mr. Hedlund by, *inter alia*, grabbing him, placing him in handcuffs, grabbing his cellphone, and searching Mr. Hedlund.

205.    Defendant Wright knowingly, willfully and wantonly, intentionally, directly and/or by being present and explicitly encouraging such behavior, battered Mr. Hedlund by, *inter alia*, grabbing him to place him in handcuffs, seizing his cell phone, searching Mr. Hedlund, grabbing him to place him in the vehicle for transportation, touching him to remove him from the vehicle at the Richmond Justice Center, and any other time that Defendant Wright otherwise touched Mr. Hedlund.

206.    Defendant Enz and Tolbert were present at the time of these batteries by defendants Mulheim and Wright, and by word, action and/or deed encouraged the same.

207.    The Defendants' touching of Mr. Hedlund was harmful, offensive, excessive and disproportionate, and conducted without lawful justification or excuse, as it was an unlawful arrest and any touching pursuant to an unlawful arrest is a battery.

208.    As a direct and proximate cause of the Defendant's battery of him (either directly or by their presence and encouragement), Mr. Hedlund suffered damages as described herein,

and therefore, the Defendants are liable to Mr. Hedlund for compensatory damages for the common law tort of battery.

209.    Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Mr. Hedlund's rights, and thus punitive damages for common-law tort of battery are warranted.

**COUNT VIII – Common Law False Imprisonment.**
**Seeking Compensatory and Punitive Damages**
**Against Defendants Mulheim, Wright, Tolbert, and Enz.**

210.    Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

211.    This is a claim for common law false imprisonment.

212.    The Defendants Mulheim and Wright seized Mr. Hedlund without legal justification or excuse and placed Mr. Hedlund in handcuffs and in a full custodial arrest.

213.    Defendants Tolbert and Enz were present for this and encouraged such arrest through word, deed, and action.

214.    Defendants Wright and Enz placed Mr. Hedlund in a patrol vehicle, took him to the magistrate, obtained an arrest warrant for Trespass against Mr. Hedlund with Mr. Hedlund present.

215.    Defendants Mulheim and Tolbert were present for this and encouraged it through word, deed, and action.

216.    At all times relevant herein, the Defendants acted with the intention of confining Mr. Hedlund within fixed boundaries, and their conduct directly or indirectly resulted in such confinement, and Mr. Hedlund was aware of such the confinement.

217.    Such actions further caused Mr. Hedlund to be confined in the John Marshall General District Court for various pretrial hearings leading up to the ultimate nolle pross, compelling such participation and presence via the implied force of the state, and due to such implied use of force, Mr. Hedlund was afraid to leave and/or not appear before the Court.

218.    The Defendants imposed by force and threats of force this unlawful restraint upon Mr. Hedlund's freedom of movement by, *inter alia*, using force, handcuffs, a full custodial arrest, locking him in a patrol vehicle, an arrest warrant, bond, and the threat of capias and/or show causes for failure to appear.

219.    At no time during these actions did the Defendants inform Mr. Hedlund that he was free to leave, and under the circumstances, no reasonable person would have believed that he or she was free to leave, effectively limiting Mr. Hedlund's free movement under the auspices of unfounded legal authority.

220.    At the time of this continuing detention, the Defendants knew or should have known that they neither had a reasonable articulable suspicion or probable cause to believe that Mr. Hedlund had committed any crime or posed any danger to the Defendants or any other person.

221.    In restricting Mr. Hedlund's freedom of movement in such a manner, the Defendants acted intentionally, willfully, maliciously, and recklessly.

222.    As a direct and proximate cause of the Defendant's battery, Mr. Hedlund suffered damages as described herein, and therefore, the Defendants are liable to Mr. Hedlund for compensatory damages for the common-law tort of false imprisonment.

223.    Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Mr. Hedlund's rights, and thus punitive damages for common-law tort of false imprisonment are warranted.

**COUNT IX – Illegal Search in Violation of Virginia Code § 19.2-59.**
**Seeking Compensatory Damages, Punitive Damages**
**Against all Defendants and Declaratory and/or Injunctive Relief against Defendants**
**Wright and Enz.**

224.    Mr. Hedlund repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

225.    This is a state law claim for a civilly enable Virginia criminal statute prohibiting warrantless searches that violate the Fourth Amendment to the Constitution of the United States.

226.    As described herein, the Defendants (either directly or by their presence and encouragement) searched Mr. Hedlund – Defendant Mulheim on the spot of the arrest with Defendants Wright, Tolbert, and Enz present and encouraging the same by word, action or deed, and Defendant Wright searched Mr. Hedlund at the Richmond Justice Center with the participation, presence, and encouragement by word action or deed of Defendant Enz.

227.    At the time that the Defendants searched Mr. Hedlund, the seizure and arrest was not lawful, and they had no reason to believe that Mr. Hedlund was either armed or in possession of contraband.

228.    As is evidenced by, *inter alia*, the Defendants' violation of Mr. Hedlund's clearly established laws prohibiting warrantless searches, unreasonable force, and unreasonable arrests without probable cause, and their First Amendment violative motivations, the Defendants' actions were *at least* grossly negligent and thus they are not entitled to sovereign immunity.

229.     Therefore, these Defendants are guilty of having committed malfeasance in office, *at least* once, and Defendants Wright and Enz, twice.  Meaning Defendant Wright and Enz shall be forever barred from holding public office and pursuant to law shall forfeit their office.

230.     As a direct and proximate cause of the Defendants' illegal search (either directly or via their presence and encouragement), Mr. Hedlund suffered damages as described herein, and therefore, the Defendants are liable to Mr. Hedlund for compensatory damages for their violation of Virginia Code § 19.2-59.

231.     Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Mr. Hedlund's rights, and thus punitive damages for their violation of Virginia Code § 19.2-59 are warranted.

232.     Additionally, as both defendants Wright and Enz committed these illegal searches *twice*, this Court should declare that Defendant's Wright and Enz have forfeited their offices and enjoin them from future employment as law enforcement officers in the Division of Capitol Police or any law enforcement agency in the United States of America or any of its territories.

## COUNT X – MALICIOUS PROSECUTION
### Against all Defendants

233.     Mr. Hedlund incorporates the previous paragraphs in the complaint herein by reference.

234.     It is clearly established law that in the commonwealth of Virginia, not only is a person who commits malicious prosecution, and all those who are present and encourage the same liable to the Plaintiff for the tort, but also person who is sets the prosecution, in motion; that is put it "on foot." *See*, *e.g., Clinchfield Coal Corp. v. Redd*, 123 Va. 420, 430 (1918).

235.     In this matter, Defendants Mercer, Pike, Sykes, and Gill set in motion the prosecution of Mr. Hedlund by designing a plan to allege that Mr. Hedlund needed a permit to

demonstrate with his Sign at the Demonstration area, all while having at least *scienter* that no such permit was required and then ordering, or being present and encouraging by word or deed the order to defendants Mulheim, Wright, Enz, and Tolbert to arrest Mr. Hedlund if he did not either quit his demonstration or leave the area.

236.    Defendants Mulheim, Wright, Enz, and Tolbert either directly, or via presence plus encouragement in word, deed, or action, initiate criminal charges against Mr. Hedlund consistent with the plan and order of Defendants Mercer, Pike, Sykes, and Gill.

237.    No defendant had probable cause to believe that Mr. Hedlund needed a permit from DGS in order to demonstrate with his Sign and the Demonstration Area on Friday, January 14, 2022.

238.    All defendants acted with malice, that is they were motivated by something other than a desire to see justice done, to punish the guilty, or uphold the law.  Rather their motivation was content-based censorship, and a desire to retaliate against Mr. Hedlund for the expressive content of his protected First Amendment Activities.

239.    The criminal charges initiated against Mr. Hedlund ended in a manner not unfavorable to Mr. Hedlund.

240.    As a direct and proximate cause of the malicious prosecution, Mr. Hedlund suffered damages as described herein, and therefore, the Defendants are liable to Mr. Hedlund for compensatory damages for their malicious prosecution of him.

241.    Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Mr. Hedlund's rights, and thus punitive damages for their malicious prosecution of him are warranted.

## PRAYER FOR RELIEF

**WHEREFORE,** the above premises considered, Plaintiff respectfully prays that this Honorable Court:

(1)     Enter judgment in the sum of 250,000.00 in compensatory damages or any such sums as the trier of fact may award, and punitive damages in the amount as the trier of fact may award, jointly and severally against the Defendants.

(2)     For Count IX, (State Statutory Search), declare that Defendants Mulheim and Tolbert have committed malfeasance in office by virtue of having conducted their illegal searches of Mr. Hedlund, that Defendants Wright and Enz have twice committed malfeasance in office by their illegal searches of Mr. Hedlund, and enjoin Defendants Enz and Wright from continuing their employment as law enforcement officers at the Department of Capitol Police, or any other policing agency and enjoin them ever again from holding public office as set forth in Virginia Code § 19.2-59.

(3)     Mr. Hedlunds costs, expenses, and attorneys' fees as provide by, *inter alia* 42 U.S.C. § 1988 and its attendant case law.

(4)     Pre- and post-judgment interest, and

(5)     Any such further relief as this Court deems warranted.

**Respectfully submitted,**

By:  /s/  Jonathan M. Arthur, Esq.
                    Counsel

Jonathan M. Arthur, Esq. VSB # 86323
j.arthur@robertslaw.org
Thomas H. Roberts, Esq. VSB # 26014
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. VSB # 80143
andrew.bodoh@robertslaw.org
Thomas H. Roberts & Associates, P.C.
105 South 1st Street
Richmond, VA 23219
(804) 991-4308 (Direct)
(804) 783-2000 (Firm)
(804) 783-2105 (Fax)
*Counsel for Plaintiff*